Bell Telephone Company of Pennsylvania *v.* Dravo Corporation, Appellant.

Argued March 28, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*John R. Bredin,* with him *Dalzell, McFall, Pringle & Bredin,* for appellant.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for appellee.

OPINION BY MR. CHIEF JUSTICE DREW, May 29, 1952:

A submarine cable running under the Ohio River and belonging to The Bell Telephone Company of Pennsylvania, plaintiff, failed, making necessary extensive repairs costing $4,971.23. Plaintiff brought this suit in trespass against Dravo Corporation, defendant, alleging that the failure had been caused by one of its tow boats striking the cable. The jury returned a verdict for plaintiff for the total cost of the repairs and from a judgment on the verdict, defendant has appealed, assigning as error the refusal to grant a judgment n.o.v.

In 1922, plaintiff was granted a permit by the District United States Engineers to lay a submarine cable in a trench three feet beneath the bed of the Ohio River between Coraopolis and Hayesville. The cable was installed in compliance with that permit and was in continuous operation thereafter without disruption until the afternoon of June 9, 1948. When the failure occurred on that date, plaintiff immediately began raising the cable to determine the exact place of failure and its cause. At a point 66 feet from the Coraopolis shoreline a sharp indentation was found in the cable. The trouble spot was found 77 feet further out at a splice in the cable. At the time the stoppage occurred the towboat "Freedom", owned by defendant, with four

barges attached, was maneuvering close to shore in the vicinity of the cable crossing. It is plaintiff's theory, and the jury so found, that defendant's boat struck the cable at the place where the indentation appeared causing a break at the splice which admittedly was the weakest point.

Plaintiff produced the following evidence which tends to support that conclusion: The indentation in the cable 66 feet from the Coraopolis shore was obviously caused by the exercise of a strong force on the cable. The steel protective covering on the cable was bright and shiny at that point, whereas the rest of the cable was dull and rusted, indicating that the mark was of recent origin. At the time of the break in telephone service, defendant's boat was operating 50 to 75 feet from shore as it rearranged its tow after leaving a barge at a nearby dock. Two witnesses testified that they heard a rumbling or scraping noise when the boat was in that area and that the water to the stern of the boat was muddier than usual. There was further testimony that a small seaplane base nearby was broken loose from its moorings and a rowboat overturned.

The towboat was equipped with a kort nozzle which is a tube or casing that houses the propeller and is so designed to give the boat greater thrust. Plaintiff produced an expert witness who stated that if the cable were exposed on the river bed for a distance of at least ten feet and the kort nozzle passed within a foot and a half of the cable, it would be capable of lifting the cable into a position where it could be struck by the bottom of the boat. Plaintiff also produced evidence that the boat had a draft of seven feet, nine inches, and that the water fifty feet from shore was only seven feet deep. All of these facts would tend to prove that defendant's boat struck the cable.

It was not, however, sufficient for plaintiff to show only that defendant struck the cable. Admittedly the Ohio River is a navigable stream and the rule is well established that ships have the paramount right to use navigable waters free from obstruction: *Western Union Tel. Co. v. Inman & I. Steamship Co.,* 59 Fed. 365; *United States v. Henry Steers, Inc.,* 8 F. Supp. 363. The burden was on plaintiff to show that the cable was maintained so that it would not constitute an obstruction to navigation: *Western Union Tel. Co. v. Inman & I. Steamship Co.,* supra. Therefore, it was incumbent upon plaintiff to show that the cable was maintained in its original position or at least in a position where it would not obstruct navigation. The only evidence offered by plaintiff to meet that burden was the testimony of its expert that a boat going back and forth over the cable could have the effect of digging a trench and exposing it. But that statement was merely a broad generality and in regard to these facts he stated his opinion in this manner: "I believe this operation of this boat and *other boats* in that same location had probably either exposed the cable or brought it very close to the surface so it could be lifted by a boat moving forward over the cable." (Italics added.) The only reasonable inference from that evidence is that it was the action of many boats that caused the cable to be exposed and not just the maneuvers of defendant's boat on this particular day. That being true, then the accident did not occur because of any negligence on the part of defendant but because of plaintiff's failure to maintain its cable in a proper manner. Plaintiff should have known that over a period of years boats passing over the cable might uncover it and cause just such an accident as occurred. Having failed to employ the necessary maintenance to prevent the cable from being struck, they cannot complain that the foreseeable did in fact happen.

Nor can defendant be convicted of negligence because it was maneuvering closer to shore than was usual in what was relatively shallow water. Substantially the same facts prevailed in the *Western Union Tel. Co.* case, supra, where a ship struck plaintiff's cable while maneuvering through a mud bank. The U. S. Court of Appeals for the Second Circuit held that as long as a ship is proceeding under its own power it is navigating and the cable must be maintained so that it will not interfere with such navigation. That same principle is applicable here. Defendant's boat was navigating the river in a way it had a right to do. It was justified in assuming that the cable would be maintained so that it would not obstruct navigation and hence could not be struck by its boat.

Plaintiff failed to prove that defendant was guilty of any negligence. On the contrary, the record conclusively proves that the accident could not have happened had plaintiff properly maintained the cable. Under these circumstances plaintiff cannot recover for the damages to the cable.

Judgment reversed and here entered for defendant.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The evidence of the negligence of the defendant company in this case amounts to moral certitude. Extensive estates have changed ownership, vast monopolies have been liquidated, far-reaching injunctions have issued and men have been hanged on evidence less convincing than that which established in the case at bar that the one thousand horsepower towboat known as the "Freedom" struck and seriously damaged the underwater cable of the Bell Telephone Company at the Coraopolis crossing of the Ohio River on June 9, 1948.

The cable (which is three inches in diameter and contains 208 pairs of wire,) was laid in 1922 in accordance with specifications of United States Army engineers. Imbedded in a trench three feet below the bed of the river, it functioned faultlessly for twenty-six years. On the afternoon of June 9, 1948, a heavy rumbling and scraping noise was heard in the vicinity of the cable crossing, the surface of the stream broke into muddied violent churning, the turbulent water overturned a rowboat, threatened the dock offshore and tore a seaplane base loose from its moorings. At this very moment the "Freedom" was operating and maneuvering over the site of the cable. No other craft was in the vicinity or even within view on the river. When the cable was hoisted to the surface it revealed an "indentation" at a point 66 feet from the shore which marked the area where the "Freedom" with a tow of six barges had been operating at the time of the noted agitation in the river. The draft of the "Freedom" when loaded was 7 feet 9 inches, and at the time the cable failed the vessel was operating at that point where the cable was only 7 feet below the surface of the water.

If all the properties and forces taking part in this episode had been enclosed within a sealed cofferdam, the exclusion of outside factors or possibilities could not have been better controlled. How, then, can the Majority Opinion assert that the facts do not show that it was *only* the "Freedom" which struck the cable? If we accept the integrity of Nature's laws and the scientific constancy of physics revealed through unquestioned circumstances, we are drawn impellingly to the inevitable conclusion that the break in the telephone cable could only have occurred because of the submarine violence precipitated by the powerful kort nozzle propellers of the defendant's vessel, since, it is

repeated, there was *no other craft* on the river at the time and place of the accident.

The Ohio River at the Coraopolis crossing is a placid stream flowing between verdant banks, uninfluenced by currents, rapids, dikes or dams. In the absence of any evidence that the abrupt turbulence in the water was caused by some submarine monster, innate intelligence, sitting in the jury box of common sense, must declare the "Freedom" guilty of fouling the cable and inflicting the damages of which the plaintiff complains.

Had there been evidence of a gradual weakening of the service supplied by the cable, a theory of deterioration might have been argued, but all the evidence in the case points to violence and trauma occurring on one particular day at one particular moment. One witness testified that the cable was encased in a quarter of an inch steel mesh of such solidity that a sledge hammer blow would not make any mark on it. Yet when the cable came to light it revealed a "shiny indentation" and "considerable kinking," items of damage and distortion which could have been produced only by the application of extraordinary force. What was this extraordinary force? Could it have been any thing other than the "Freedom" which was strenuously pushing and pulling six barges—one empty and five laden with sand and gravel—at the very spot the cable kinked?

Although termed a towboat, the "Freedom" is a vessel of handsome proportions, being 116 feet long with a beam of 27 feet, and draft, as above indicated, of 7 feet aft and 6 to 7 feet forward. Two of the barges which were being towed were 135 feet long and two were 175 feet long, with beams of 26 feet and drafts of from 6½ to 8½ feet.

The staff captain of the "Freedom" was not on duty on June 9, 1948, but the "swing pilot" in charge knew

of the cable crossing, the presence of which, aside from general river and navigational knowledge, was proclaimed by a huge sign on the Coraopolis shore.

There is not one link missing in the chain of evidence which ties the "Freedom" to the cable breakage as securely as an anchor chain holds a ship in the harbor.

The jury in this case, after listening to evidence for four or five days in a trial conducted by able and experienced counsel and presided over by the distinguished and veteran jurist Judge WILLIAM H. MC-NAUGHER, who delivered a most illuminating charge on the issue of fact involved, returned a verdict for the plaintiff. I do not believe that we should substitute our judgment for that of the jury, in the absence of any indication (as indeed the record shows none) that the jury went astray.

The proposition, mentioned in the Majority Opinion, that other boats may have caused a displacement of the cable, was presented to the jury as part of the defendant's case, but the jury found against that theory.

The reasoning which would defeat the plaintiff's verdict, fairly and squarely won in the assizes, is a reasoning which would upset any decision because it uses theory for facts and supposition for logic. The river of conjecture flowing on to the sea of presumption can carry on its boundless bosom fleets of hypotheses and armadas of surmise, but they will never reach the port of reality and never sail into the harbor of objective revelation.

To wipe out the promontory of fact in this case and substitute for it the mirage of speculation is to deny the plaintiff company of its constitutional right of trial by jury. The Majority Opinion would make the Court in this case a super trier of facts. It looks at all the facts and says there should be other facts; it considers

all the inferences and says there should be other inferences; it weighs the probabilities and says there must be more possibilities. By this decision the Majority Opinion gives to the culprit craft a latitude of mischief never intended in its name.

Not only in the interests of justice but in appreciation of the very reassuring laws of cause and effect which impart order and stability to this whirling world of awesome phenomena, I would keep hands off a verdict which is intelligent, fair, honest and just; and I would affirm the judgment entered below by the learned Court of Common Pleas of Allegheny County.

---

DISSENTING OPINION BY MR. JUSTICE BELL, June 5, 1952:

The jury found a verdict for the plaintiff. Taking the evidence in the light most favorable to the plaintiff, as we must on a motion for judgment n.o.v.: *Miller v. P. R. R.*, 368 Pa. 507, 84 A. 2d 200; *Miller v. Hickey*, 368 Pa. 317, 81 A. 2d 910; there was, in my opinion, adequate evidence from which the jury could have found that the defendant was guilty of negligence and that plaintiff was free from contributory negligence. For these reasons I would affirm the judgment.