## H. J. LEWIS OYSTER CO. v. UNITED STATES et al.

### No. 48806.

United States Court of Claims.
Oct. 7, 1952.

The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes the following Special Findings of Fact:

1. Plaintiff, The H. J. Lewis Oyster Company, is a Connecticut corporation engaged in the propagation of seed oysters. It leases a total of 5,573.2 acres of oyster grounds from the State of Connecticut of which 1,657.2 acres are located in the outer harbor near Bridgeport, Connecticut. The other grounds leased by plaintiff are in Westport, Milford, West Haven, and New Haven, Connecticut. Companies affiliated with plaintiff lease and operate oyster grounds at Shelter Island and Greenport on Long Island in the State of New York. The oyster grounds at Bridgeport are used for the obtaining of set, hereinafter explained, and for the production of seed oysters; the grounds at Milford and Westport for growing; and the grounds at Long Island for fattening the oysters prior to sale on the commercial market. An oyster ground used for the propagation of oysters is known as a set lot.

2. The oyster spawning season occurs in Bridgeport during the latter part of July and in August. In the last week of June and the first weeks of July oyster shells are planted on the grounds. The oyster spawn then attaches itself to the shells. The spat (the oysterman's name for the spawn after it is attached to the shell) is allowed to remain until it obtains a size large enough to be transferred safely to the growing grounds. The set (the oysterman's term for the very young oyster) is usually shifted to the growing grounds in the autumn following the spawning season or in the spring of the next year. In the normal operation of a setting ground, the oyster set is removed every year. Not all of the set can be removed during the annual transplanting; the ground is deemed to be cleaned off when the yield of oysters or set is not more than 100 bushels per day, per boat.

3. Lots 710, 780, and 816, are used by plaintiff as set lots. These lots have an area of 103.2 acres, 44.8 acres, and 143.4 acres, respectively.

A lot which has not been planted with oyster shell within a period of three years is not being used as a set lot. Lots 729, 805, 810, 815, 831, and 833 had been cultivated before World War II but none of them has been planted with shell since 1942. Lots 834, 835, 836, and 838 have never been cultivated.

Lot 805 has been used since 1934 as a storage ground for shells accumulated on plaintiff's growing grounds in Milford and Westport. In the spring of 1948 the live oysters, which had accumulated naturally, were transferred from this lot to Lot 816.

4. The H. J. Lewis Oyster Company was purchased by the present owners in 1944. At that time no inventory was taken of the oysters on the lots at Bridgeport. There is no way to determine the number of oysters which were on the lots in 1947, since no regular inventory is taken. The lot records show only the total amount of both oysters and shell on the lots. No record is kept of the annual set, nor do the captains of the oyster boats make a regular count of the number of live and dead oysters taken up in the oyster dredging operations.

5. It has been estimated that the natural mortality rate for oysters in Long Island Sound runs between eight and twelve percent annually. It is not unusual to find that at least half of the oysters on a lot have been killed by natural causes. A severe storm may cover the oysters on a lot with silt and sand and will do a considerable amount of damage. Such a storm occurred at the beginning of November 1947. The most serious marine enemy of the oyster in Bridgeport has been the starfish; these were very bad in 1947 and 1948. It is also possible that the small oysters in the Bridgeport area have been attacked by small drills, and that some oysters have been killed by pollution from the industries in Bridgeport.

The oysters on plaintiff's beds are not evenly distributed but occur in various thicknesses up to piles as high as one foot thick. This practice of leaving the oysters in a pile adds to the natural mortality rate.

6. On April 3, 1947, the defendant, acting through the Corps of Engineers, entered into a contract with the Arundel Corporation to improve the channel into Bridgeport Harbor. The existing channel was 300 feet wide and 25 feet deep; the contract called for deepening the channel to 30 feet, extending it seaward approximately 7,500 feet to the 30-foot contour, and widening it to 400 feet. The work was started on June 4, 1947, and was completed on February 16, 1948.

The dredging done under the contract was new work; i. e., it was to make a new channel and not maintenance work on the existing channel. The dredging was performed in the outer harbor (outside the breakwater), in the inner harbor, and in various streams discharging into the inner harbor. The bulk of the work outside of the breakwater was performed by the clamshell dredge *Maryland* which worked from June through October, 1947. The *Maryland* removed a total of 925,000 cubic yards place measurement of material from the entrance channel. This material was quite firm and consisted of a mixture of about seventy percent mud and thirty percent

sand. A total of 1,000,000 cubic yards, scow measurement, was removed by the *Maryland* and dumped in the dumping ground located some five miles off the shore of Bridgeport Harbor. When the material is dredged from the channel and placed in the scows it expands and increases its volume by about eleven percent.

A dipper dredge, the *Warfield*, was used in a portion of the entrance channel located from 300 feet to 2,000 feet from breakwater. The *Warfield* was used to remove a hard sand which could not be handled by the *Maryland*. The material taken up by the *Warfield*, a total of 225,000 yards scow measurement, was also dumped at the dumping ground.

A hydraulic dredge, the *General*, worked on the entrance channel near the breakwater. The *General* removed about 50,000 yards of sand from the outside of the breakwater, which sand was pumped on to the shore at the base of the eastern arm of the breakwater to form a beach. An additional 75,000 yards of material was dredged by the *General* from areas inside of the breakwater and pumped behind bulkheads on the shore in the Johnson's River area.

All of the dredging and allied operations were conducted under careful supervision. The *General* and *Warfield* dredged only sand in the outer harbor, the particles of which were too heavy to be carried by the water currents to plaintiff's oyster grounds. The *Maryland* used a 15 cubic yard clamshell bucket. The operation of the *Maryland* discolored the water around the dredge and scows for a distance of about 200 yards. The mud retained its shape while in the bucket and in the scow, and did not leak out of the bucket. The bucket was carefully lowered so as to place, and not drop, the mud into the scow pockets. No mud was lost from the scows en route to the dumping ground.

As noted above, the clamshell dredge *Maryland* removed a total of 925,000 cubic yards, place measurement, of material, and a total of 1,000,000 cubic yards, scow measurement, was carried to the dumping ground. The 11 percent expansion factor applied to place measurement in arriving at scow measurement, would leave unac-counted for some 26,700 cubic yards scow measurement of material excavated which did not reach the dumping ground.

7. Section 4773 of the Connecticut General Statutes, provides as follows:

"Agreements to indemnify the United States. The governor, with the approval of the finance advisory committee, is authorized to give assurances that the state will hold and save the United States free from claims or damages resulting from any such improvement or protection project and to enter into an agreement with the federal government for such purpose."

Pursuant to this provision, the Governor of Connecticut, with the approval of the finance advisory committee, executed on September 3, 1946, the following assurance on behalf of the State of Connecticut in connection with the improvements to the Bridgeport Harbor:

### Assurance of The State of Connecticut

"*Whereas*, the Congress of the United States, by Acts approved March 2, 1945 [59 Stat. 10], and July 24, 1946 [60 Stat. 634], has authorized projects for the improvement of Bridgeport Harbor and Johnsons River in the State of Connecticut, in accordance with plans contained in House Document No. 819, 76th Congress, 3rd Session and House Document No. 680, 79th Congress, 2nd Session, and

"*Whereas*, the Congress has appropriated Federal funds for the initiation of the projects, and

"*Whereas*, the expenditure of the appropriation is subject to the condition in the Act approved March 2, 1945, that local interests hold and save the United States free from claims for damages resulting from the improvement and subject also to the conditions in the Act approved July 24, 1946, that local interests make necessary changes in the Pleasure Beach Bridge; give assurances satisfactory to the Secretary of War that they will provide suitable berthing and unloading facilities for large tankers on the main harbor turn-

ing basin and adequate terminals on Johnsons River; furnish free of cost to the United States all lands, easements and rights-of-way and suitable bulkheaded spoil disposal areas for the initial work and for subsequent maintenance when and as required; and hold and save the United States free from damages resulting from the improvement, and

*    *    *    *    *    *

"*Now Therefore*, the said Governor, pursuant to said Act of the General Assembly and in furtherance of the projects approved by the Congress of the United States hereby approves the projects hereinbefore mentioned and assures the United States that the State of Connecticut will hold and save the United States free from damages or claims for damages resulting from such improvement."

8. An oyster is essentially a living mechanism for pumping turbid water through a sieve, removing all the particles except a small proportion of the smallest size, rejecting part of this material and passing part of it through its mouth and digestive tract. This process is accomplished by means of the oyster's gills and palps or lips of the oyster's mouth. Both the matter rejected and that passed through the oyster become agglomerated by a kind of mucous and from time to time may be ejected from the oyster by the snapping of its shell.

The oyster therefore is itself a creator of mud, and since it cannot change its location it cannot move away from the mud it produces. It has been said that the life of an oyster is a race with mud, and desirable oyster beds are those which are located where currents or scouring prevent the accumulation of mud in sufficient quantities to harm the oysters.

It is agreed by authorities that oysters when covered by mud, either of their own creation, or by deposit from external sources, will be killed. Authorities disagree as to the effect upon oysters of excessive turbidity of the water in which they live. Dr. Loosanoff, a recognized authority on oysters, has found that the immediate effect of increasing the turbidity of the water is to slow the oyster's rate of feeding. Whether this effect would continue, if prolonged, has not been demonstrated. It is a fact that oysters do live and thrive in water of a considerably higher turbidity than occurs in Bridgeport Harbor.

9. In the effort to determine whether silting of plaintiff's oyster beds was occurring by reason of the defendant's dredging operations, both plaintiff and the State of Connecticut placed silt traps in the area during the dredging and during the following year when no dredging was in progress. An effort was made to raise the traps periodically and measure the accumulated deposits found in them. Some effort was also made by plaintiff to ascertain the grain sizes, and it was found that such sizes diminished as the distance from the dredging operation increased. The unreliability of the silt trap tests is that they do not indicate what is happening on the surrounding bed of the harbor, since by its nature the silt trap eliminates the scouring effect of currents and tides. The waters of Bridgeport Harbor are normally turbid, and during the year when dredging was not going on, the silt traps caught material at a rate sufficient materially to change the contours of the harbor bed over a period of years, had such material remained on the bed. As a matter of fact, however, there has been no appreciable change in such contours over the years.

10. A more reliable indication of the effects of the dredging is found in the experience encountered by plaintiff in its oyster dredging operations in the fall of 1947 and the spring and early summer of 1948. It is clear that in these operations considerably more mud was encountered on the oysters than had been the case in normal years. Upon making sample tests it was the opinion of the dredging captain that about 25 percent of the oysters dredged had been killed by mud. As stated above, the oysters did not lie in even thicknesses on the beds, but sometimes in ridges a foot deep. Furthermore, in the spring of 1947, a quantity of oysters and shell were removed by plaintiff from Lot 805 and stored

on Lot 816, and it is highly probable that many were placed in ridges as much as 1 foot in thickness. Where oysters lie in thicknesses 1 foot deep or more, it is inevitable that those toward the bottom of the pile will be suffocated by the mud which they themselves produce. It is therefore impossible to determine with any accuracy the proportion of those killed by mud which resulted from the dredging operations and those which died from mud produced by themselves.

Moreover, a storm such as occurred in November 1947 has the effect of stirring up the material found on the shores and on the bottom of a body of water, thus increasing the turbidity of the water and the deposition of solid material on the bottom as the waters become calm.

Due to the fact that plaintiff's estimates of the oysters killed by the dredging operations were based on a few samples, due to the inherent difficulty of diagnosing the cause of their death, and due to the further difficulty of segregating the effects of the dredging and of the storm, it results that the proportion of oysters killed by the dredging is not susceptible of exact measurement. However, as shown above, there were dredged from the channel some 26,700 cubic yards, scow measurement, of material which did not reach the dumping ground, and it is reasonable to suppose that the muddy condition of the oyster beds referred to above was principally attributable to the dredging.

11. During the fall of 1947, prior to the occurrence of the storm referred to hereinabove, plaintiff dredged 19,350 bushels of set from Lot 710, of a value of approximately 90 cents per bushel. Of samples examined, about one-half of the oysters were dead, and it was the opinion of plaintiff's employees that about half of the dead oysters were killed by mud. A fair approximation of the value of the oysters dredged, whose death may be attributed to the dredging is $4,000.

12. In the first five months of 1948, 13,435 bushels of material were transplanted from Lot 805 to Lot 816. Approximately half of the material was shell and half was oysters. Of samples taken of the oysters half were dead, and in the opinion of plaintiff's employees half of the dead oysters had been killed by mud. In view of the occurrence of the storm hereinabove mentioned, and its effect in silting the bottom, a fair approximation of the oysters in this operation whose death may be attributed to the dredging is 850 bushels, of a value of approximately $2.50 per bushel, or $2,125.

13. The plaintiff claims further that there should have been remaining on the beds, in addition to the oysters dredged and removed, large quantities of oysters, and that of these a percentage should be found to have been killed by the dredging operation. Due to the uncertainty of the quantity of oysters remaining on the bottom, the uncertainty as to whether they would be removed in the future, before death overtook them from natural or other causes, and due to the further inherent uncertainties referred to hereinabove, the claim on this item is considered too speculative.

14. Plaintiff claims a large sum for harrowing the oyster beds in order to stir up the deposited mud and allow the currents to carry it away. This operation is one which is normally performed every year before the spawning season, in order to brighten up the shells lying on the bottom for receiving the spat. Plaintiff claims that by reason of the mud precipitated from the dredging operations this harrowing or stirring operation was much more extensive and required more time at an expense of $500 per day for the operation of its three oyster boats.

In view of the history of the oyster beds in Bridgeport Harbor, and in view of the normal turbidity of the water in the harbor area, it must be assumed that the normal scouring of the currents in the harbor, which has prevented any appreciable siltation over the years, is the primary agency for removing any silt deposited from the dredging. Unless the widening and deepening of the entrance channel has materially changed such currents, a fact which has not been demonstrated, it must be asssumed that the normal operation of stirring the deposited mud, aided by such currents, will

restore plaintiff's oyster lots to their former condition.

15. The enlargements of the channel took 7.43 acres from plaintiff's Lot 816, and .89 acre from plaintiff's Lot 815. For tax purposes plaintiff valued the interest which it possessed in these lots or oyster beds under its leases from the State of Connecticut at $33 per acre. The value of plaintiff's interest in the 8.32 acres, the use of which was destroyed, is $274.56.

16. Plaintiff's damage, therefore, is as follows:

| | |
|---|---:|
| Oysters killed from dredging on Lot 710 | $4,000.00 |
| Oysters killed from dredging on Lot 805 | 2,125.00 |
| Acreage taken | 274.56 |
| Total | 6,399.56 |

Curtiss K. Thompson, New Haven, Conn., John H. Weir, Hartford, Conn., and Goodman Block, New York City, on the briefs, for plaintiff.

Jack Rubin, Hartford, Conn., George C. Conway, New Haven, Conn., on the brief, for intervenor.

Gilbert E. Andrews, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

The plaintiff, The H. J. Lewis Oyster Company, is the lessee of 1,657.2 acres of oyster grounds, owned by the State of Connecticut and located in the outer harbor of Bridgeport, Connecticut, which it uses for the propagation of oysters.

On April 3, 1947, the Corps of Engineers, as agent of the United States, entered into a contract with a private construction company to improve the channel into the Bridgeport harbor by deepening the existing channel from 25 to 30 feet, by widening it from 300 to 400 feet, and by extending it seaward approximately 7,500 feet. In order to make possible the channel extension, it was necessary to take 8.32 acres from two of the lots leased by plaintiff, lots 815 and 816, which were located directly in its path. Plaintiff's other lots were located in the vicinity of, but in varying degrees of proximity to, the channel improvements.

Work on the dredging and associated operations involved in the performance of this project was commenced on June 4, 1947, and was completed on February 16, 1948. During this period, and the period immediately following the completion of the dredging operations, plaintiff discovered substantially more mud and silt deposited upon its oyster beds than it customarily found. Where such mud was deposited in sufficient quantities to cover the oysters, they were suffocated. Plaintiff insists that the only circumstance which could account for deposits of mud in the quantity encountered was the dredging operation conducted by defendant, and that under the provisions of the Act of August 30, 1935, ch. 831, § 13, 49 Stat. 1049, as amended, 28 U.S.C. (1946 Ed.) § 250a,[1] it is entitled to be compensated for the damage to the various phases of its oyster operations, which allegedly totalled $194.057. Section 250a provides as follows:

"the Court of Claims shall have jurisdiction to hear and determine claims for damages to oyster growers upon private or leased lands or bottoms arising from dredging operations and use of other machinery and equipment in making such improvements".

Defendant contends that plaintiff has in general failed to prove any damage to its oyster grounds, other than the damage to plaintiff's interest in the acreage actually consumed in the channel enlargement, and has in particular failed to establish that any appreciable amount of mud or silt removed during the dredging operations was de-

---

1. Section 250a was in effect at the time plaintiff instituted this action, but was supplanted by the 1948 revision of Title 28 contained in the Act of June 25, 1948, ch. 646, § 1, 62 Stat. 941. This provision is now set forth in 28 U.S.C. (Supp. V), § 1497 which contains minor changes in phraseology, but not in substance.

posited upon its oyster beds. The State of Connecticut, pursuant to an act of its General Assembly, whereby it agreed to hold the United States free from any damages resulting from these improvements, has intervened in this action to assert arguments substantially the same as those urged by defendant.

Before considering whether or not plaintiff's oyster beds were damaged by these deposits, we must first determine whether the deposits were attributable to the dredging operations conducted by defendant. Several factors enter into this determination. In the first place, the oysters, by virtue of their life processes, which are described in detail in Finding 7, are themselves producers of considerable quantities of mud. Recognized authorities upon oysters agree that the life of an oyster is primarily a race with mud. Since oysters cannot change their position, they are unable to escape the mud of their own creation, or that which may be deposited upon them from external sources. However, the amount of mud which was found upon plaintiff's oyster beds during the period here in question clearly appears to have been of such quantity as not to be attributable entirely to the oysters themselves.

Another factor which in our opinion tended to account for the siltation found on plaintiff's oyster beds was the occurrence of a severe storm in the early part of November, 1947. Experience with such storms has demonstrated that they frequently leave in their wake deposits of sand and silt which settle upon the oyster beds. Thus, it is not unlikely that the deposits found on plaintiff's holdings were due in part to this natural cause.

■ The only remaining possible source of these deposits which has been suggested by the parties, or which we can discover from the record, is the excavated material dredged from the bed of the harbor by defendant during the course of the harbor improvements. The dredging operations were performed by three types of dredges: a clamshell dredge, a dipper dredge, and a hydraulic dredge. Although the dredges were operated under careful supervision, some of the excavated material was lost in the surrounding water and frequently resulted in its discoloration for a distance of approximately 200 yards. Careful measurements were kept of the materials excavated, and these reveal that despite defendant's precautions approximately 26,700 cubic yards of excavated material did not reach the dumping ground located well beyond the harbor. From these facts it is only reasonable to conclude that the material lost in the course of the dredging operations constituted the principal source of the deposits found on plaintiff's oyster beds. Consequently, we hold that, in accordance with the provisions of Section 250a, supra, the United States must respond to plaintiff for any damages shown to have resulted from the improvement of the Bridgeport harbor.

Much evidence has been introduced as to the accuracy of the silt trap tests conducted by plaintiff and by the State of Connecticut. In order to determine whether the dredging operations were responsible for any increase in siltation, silt traps were placed at various points in plaintiff's beds during the performance of the work and also during the following year when no dredging was in progress. Periodically these traps were raised and the materials found in them were examined and measured. However, these traps tended to eliminate the natural scouring effect which the currents, tides, and normally turbid waters had upon the bed of Bridgeport harbor, and their results are therefore too unreliable to enter into our above stated conclusion.

■ As indicated above, the effect of the mud deposits was to cause the suffocation of large quantities of plaintiff's oysters. But, with the exception of two lots, plaintiff has not furnished us with any evidence as to the number of oysters destroyed in this manner. With respect to lot 710, it appears that during the fall of 1947, and prior to the storm which occurred in November 1947, plaintiff removed therefrom about 19,350 bushels of set, i. e., young oysters, having a value of about 90 cents per bushel. Of these oysters, about one-

half were dead whereas the normal mortality rate attributable to natural causes, starfish, and oyster-produced mud, was only eight to twelve percent. In the opinion of plaintiff's employees, about one-half of the dead oysters had been killed by the mud deposits. From these facts, we think the reasonable value of the oysters destroyed by mud deposits on lot 710 was $4,000 and plaintiff is entitled to recover this sum.

Similarly, plaintiff has also established that during the first five months of 1948 it transplanted 13,435 bushels of material, composed of one-half shell and one-half oysters, from lot 805 to lot 816. Samples again revealed that about one-half of the oysters were dead, and in the opinion of plaintiff's employees, about one-half of these had been killed by mud. These oysters had a value of $2.50 per bushel. Taking into consideration the effect of the storm in November of 1947, for which defendant was not responsible, we believe that the death of 850 bushels of oysters on lot 805 may properly be attributed to the dredging operations, and that plaintiff is entitled to recover $2,125 for this loss.

Plaintiff urges that the evidence of loss found to have occurred on lots 805 and 710 affords a fair measure of the damage done to the other oysters which were on these lots at that time and which have not yet been removed, and is also typical of the damage done to oysters on its other lots located near the harbor improvements. Moreover, plaintiff insists that proof of this nature, while admittedly not computed with any degree of exactness, is sufficient under the rule expressed by this court in The Oyster Cases, [F. Mansfield & Sons Co. v. U. S.] 94 Ct.Cl. 397, and reiterated in Beacon Oyster Co. v. United States, 63 F Supp. 761, 105 Ct.Cl. 227.

In The Oyster Cases, 94 Ct.Cl. at page 420, this court made the following summarization of the type of proof required in these cases:

"It is impossible to satisfactorily calculate with any definite exactitude the amount of mud deposited on the lots, the number of lots affected in whole or in part, the number of oysters destroyed, * * *. It is impossible to fix with any accuracy how far from the channel, where operations were being conducted, that the silt and mud extended. None of these quantities and areas can be ascertained with certainty or exactness.

"The amount of damage cannot be determined with any degree of accuracy and finality. Even the values vary. However, neither the fact that damages are difficult to ascertain nor that they cannot be calculated with mathematical accuracy constitutes a bar to recovery. Hetzel v. Baltimore & Ohio R. Co., 169 U.S. 26, 18 S.Ct. 255, 42 L.Ed. 648; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Eastman Kodak Co. v. Southern Photo Material Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Paper Co., et al., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

"All that is required is the allowance of such damages as, in the judgment of fair men, directly and naturally resulted from the injury sustained."

■■ The proof offered by plaintiff as to the damages to the oysters remaining on the beds does not satisfy even these meager requirements. Inasmuch as plaintiff's proof is uncertain as to the number of oysters remaining on the bottom, uncertain as to whether the damage from the mud was the same on all lots, and uncertain as to whether the oysters would be removed in the future before death overtook them from natural causes, we must reject these claims as requests for speculative damages. Schroeder Besse Oyster Company, Inc., v. United States, 95 Ct.Cl. 729. Furthermore, plaintiff's claim as to the need for cleaning and harrowing its oyster beds in order to remove the mud deposits must be rejected in view of the natural cleaning and scouring effect of the turbid harbor waters upon the beds.

■ Plaintiff is entitled to recover for the damage to its interest in the 8.32 acres used in the enlargement of the channel. The only reliable evidence which was in-

troduced of the value of plaintiff's interest in this property was the value of $33 per acre which plaintiff placed thereon for tax purposes. This represents a total value of $274.56 which plaintiff is entitled to recover as part of its damages.

Under the terms of § 250a, supra, plaintiff is entitled to judgment against the United States in the sum of $6,399.56.

Pursuant to an act of its General Assembly, the State of Connecticut, intervenor, defendant, agreed to hold the United States free from damages resulting from these Bridgeport Harbor improvements.

Accordingly, judgment over will be entered in favor of the United States against the State of Connecticut in the sum of $6,399.56.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.