**N. Clements CARR, Libellant,**

v.

**UNITED STATES of America, Respondent.**

No. 187.

United States District Court
E. D. Virginia, Newport News Division.

Dec. 27, 1955.

Baird, White & Lanning, Norfolk, Va., Murray, Ford, West & Wilkinson, Newport News, Va., Catesby G. Jones, Gloucester, Va., for petitioner.

L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., David O. Wood, Admiralty Trial Atty., Dept. of Justice, Washington, D. C., John M. Hollis, Asst. U. S. Atty., Norfolk, Va., for respondent.

HOFFMAN, District Judge.

This action, originally instituted under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b) on April 28, 1953, seeks recovery of damages alleged to have been sustained in May, 1952, to certain oyster grounds in the northwest prong of the Severn River, Gloucester County, Virginia, leased to N. Clements Carr from the Commonwealth of Virginia. The complaint alleges that salvage boats using grapnels or dredges were negligently operated by employees of the United States Government in such a manner as to destroy the oyster grounds. It is further alleged that the actions constituted a wrongful trespass.

The Government filed a motion to dismiss alleging (1) that the Governmental Agency was not identified, nor were the employees or the boats in question stated, and (2) that any damages alleged to have been caused by public vessels were excluded from the Federal Tort Claims Act, 28 U.S.C.A. § 2680(d). Plaintiff apparently concluded that there was merit to the second ground of the Government's motion, as a motion to transfer to the admiralty jurisdiction of the Court was granted by District Judge Hutcheson under an order dated February 4, 1954. Thereafter an amended complaint by way of libel was duly filed pursuant to an order of Court, with jurisdiction being alleged under "An Act For the extension of admiralty jurisdiction", June 19, 1948, c. 526, 62 Stat. 496, 46 U.S.C.A. § 740, the Public Vessels Act, 46 U.S.C.A. §§ 781–790, and the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752. The only other material addition in the libel is with respect to notice in writing of libellant's claim having been given to the Government through the Air Force at Langley Air Force Base, Virginia, and more than six months having expired with no payment having been made.

Respondent's answer reveals, and the evidence so discloses, that the following pertinent issues must be determined:

(1) Were the jurisdictional requirements relating to filing a claim as specified in 46 U.S.C.A. § 740, met by libellant?

(2) Do the facts indicate the performance of a necessary governmental function with no analogous private liability?

(3) Does the governmental duty to remove obstructions in navigable waterways apply to the specific facts of this case and, if so, to what extent?

(4) Under the peculiar facts of this case, does the rule with respect to "paramount right of navigation in navigable waters" preclude libellant's right of recovery?

(5) The negligence, if any, of respondent.

(6) The extent of libellant's damage to his oyster grounds.

At approximately 10 P. M. on April 28, 1952, an aircraft crashed in the northwest prong of the Severn River. There were no eye witnesses but several parties indicated their assumption that a plane had crashed because of what sounded like an explosion. An unidentified party apparently located a portion of the pilot's arm and telephoned Langley Air Base on May 6, 1952. A crash boat (63 feet) was sent to the scene but returned later that day and it is not seriously urged that this initial trip caused any damage to the oyster grounds. The men on this boat were successful, however, in identifying sufficient debris to convince them that the crash had occurred in this immediate area and, on the following morning at 7:17 A. M., a landing craft (LCM) left Langley for an approximate three-hour run to the Severn River. It returned at 5:02 P. M. and, in the interim, was engaged in dragging operations. Deducting travel time, the first day's operations consisted of approxi-

mately four hours on the scene. On the next day, May 8, 1952, the LCM left at 10:32 A. M. (with a small crane designated as a "cherry-picker" on board) and thereafter remained at the scene until 6:15 P. M. on May 10, 1952. The foregoing log entries are supplemented by the following information: On May 8 at 7:55 P. M. a call was received to furnish "chow" for the men, indicating about six hours and thirty minutes working time on that day; on. May 9 the men started at daybreak and stopped at dark, thus indicating approximately twelve hours of operations during which time Navy divers worked about one hour and dragging ceased in the interim; on May 10 work was resumed at 8 A. M. and continued until 2:30 P. M. but the divers stayed down all day and presumably no dragging operations took place. Summarizing the foregoing, it would appear that dragging operations consumed approximately 20½ hours subject, however, to normal cessation of operations for the purpose of securing the debris located. In any event, it is fair to assume that at least 15 hours was devoted to the actual movement of the LCM with its grapnels.

The extent of the dragging operations with its consequent damage to the oyster bottom is in vigorous dispute. The LCM is a landing craft 56 feet in length, drawing 37¼ inches to her struts with a light load, propelled by two 225 H. P. Gray Marine engines, turning two propellers about 20 inches across, with the screws built into tunnels at the stern leaving approximately one-half of the blade exposed. The dragging equipment consisted of a 15 lb. grapnel and a smaller 5 lb. grapnel, the latter being used when over the wreckage to handle by hand. The Government witnesses confined the dragging operations (with one trip excluded) to an area 50 yards in width and 150 yards in length, or an area of 67,500 square feet. In the opinion of the Court the exactness of this testimony leads the Court to believe that this is an estimate for defense purposes only. Libellant's witnesses (one of whom testified that he was on board the LCM for three days)

stated that the LCM covered practically the entire oyster ground area in a north-south direction with 15 to 20 trips on May 7; 40 to 60 trips on May 8; and 15 to 18 trips on May 9. The witness, Rowe, testified that he could see oysters and shells coming to the top of the muddy water through the wash, and that he advised the man operating the LCM that oyster grounds were being ruined, but was told that he "had his orders". This witness said that the landing craft touched bottom on many occasions and that the screws tore up the bottom, with no change of operations as the tide fell. Rowe stated that oysters and shells were observed coming to the top of the muddy water, through the wash, during the three days of active operation with the LCM crossing libellant's oyster grounds continuously. The main portion of the aircraft consisting of a part of the wings, a portion of the body, and the wheels, was recovered and dragged through the shell pile area previously established by libellant. The engine was never located and the man in charge of the LCM indicated that his orders were not to leave any parts of the plane, thereby making it necessary to continue dragging operations after recovering the portions of the aircraft hereinabove mentioned. Similarly, the pilot's body was not recovered, other than a portion of the hand making it possible to identify the pilot by fingerprints. It is obvious that the aircraft exploded at, or immediately prior to, the time it struck the water.

Several witnesses other than Rowe described the dragging operations but their opportunity for continuous observation was rather limited. Libellant testified that his first knowledge of the operations was upon receipt of a telephone call from his wife; that he first noticed the LCM dragging on a Tuesday; that on the following day libellant went to the LCM in a rowboat and advised the man in charge of operations that libellant's oyster grounds were being ruined, to which statement the man in charge suggested that libellant wait thirty (30) days and

then put in a damage claim; that he later ascertained that he had talked to a Sgt. Thomas.

Dealing specifically with the question of liability, the defense witnesses testified substantially as hereinafter stated. Major Gassler handled the aircraft accident investigation in behalf of Langley Air Force Base, but was not in charge of operations at the scene. He presented in evidence as defendant's Ex. 13, Air Force Regulation 62–14, which, in substance, states the general policy of the Air Force in such accidents to recover as much wreckage as possible, thereby assuring preventive measures for the future. In examining this regulation, it is extremely doubtful, however, that any reasonable interpretation of the same requires exhaustive dragging operations in situations involving totally "destroyed" aircraft (Sec. 18).

Master Sgt. Austin described the dragging operations but was not aboard the LCM at all times. He visited the scene via helicopter on two occasions believed to be May 8 and 9. He indicated the LCM operation was with one engine cut out and traveling at a speed of not more than one knot for the reason that too much speed would cause the grapnel line to part. The witness admitted the existence of stakes in the water of the Severn River in the vicinity of the crash, and his knowledge that these were "oyster stakes".

Sgt. Zemansky, apparently the "on scene" man in charge of operations, stated that on the first day the drag was from Locust Point to the extreme end of the Severn River; that the return trip was the reverse of the above; that the wreckage was thereafter located and the concentrated area of dragging operations was then confined to a space 50 yards in width and 150 yards in length. Three days were consumed in dragging this relatively small area. Zemansky insists that the LCM was not hitting bottom, although he concedes that operations were conducted without regard to tide changes and that propellers were "kicking up mud" in the wash.

There is considerable dispute as to when the main portion of the wreckage was located. Sgt. Butler's recollection is that this occurred on Friday, May 9. Zemansky indicates this took place on Thursday, May 8. Rowe's memory is that it was located on Tuesday, May 6, or Wednesday, May 7. It is sufficient to state that, even after the main wreckage had been recovered, dragging continued for at least two days thereafter. Butler further testified that the LCM may have hit bottom on one or two occasions.

In the main this summarizes the facts incident to the accident and subsequent dragging operations. The balance of the evidence is devoted to the involved question of damages and the facts relative to the "notice of claim", all of which will be hereafter discussed.

### Were The Jurisdictional Requirements Relating To Filing A Claim As Specified In 46 U.S.C.A. § 740, Met By Libellant?

The provisions of Sec. 740, Title 46 U.S.C.A., are as follows:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

"In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water: *Provided*, That as to any suit against the United States for damage or injury done or consummated on land by a vessel on navigable waters, the Public Vessels Act or Suits in Admiralty Act, as appropriate, shall constitute the exclusive remedy for all causes of action arising after June 19, 1948 and for all causes of action where suit has not been hitherto filed under the Federal Tort Claims Act: *Pro-*

*vided further,* That no suit shall be filed against the United States until there shall have expired a period of six months after the claim has been presented in writing to the Federal agency owning or operating the vessel causing the injury or damage."

On July 2, 1952, a letter was mailed to the Claims Officer at Langley Field, Virginia, from Catesby Graham Jones, attorney for the now libellant, reading as follows (plaintiff's Ex. 10(c) ):

"I respectfully request information concerning the efforts of the crash boats and other craft to locate the F–84 Jet Plane which fell in the Severn River, Gloucester County, Virginia, during last April.

"I desire this information in order to intelligently file a claim on behalf of Mr. Noah Clements Carr, of Ordinary, Virginia, whose oyster planting ground was materially damaged by the activities in this connection.

"I would like to be informed as to what branch of the service commanded the boats that were used in the search and also what branch of the service would be responsible for their activities, and such other information which you may be kind enough to furnish.

"I am having Mr. Carr sound all of his oyster ground and find the extent of both the area damage and the money value of the damage. This will take some time and in the mean time I would like to have this information so that as soon as we can determine the full damage proper claim may be filed."

By letter dated July 9, 1952, Lt. Morton P. MacLeod, Claims Officer, replied (plaintiff's Ex. 10(b) ):

"This will acknowledge receipt of your letter of July 2, 1952 concerning a claim which you wish to file for a client in connection with the crash of an F–84 jet plane in the Se-

vern River, Gloucester County, during April 1952.

"This office cannot, without authority from higher headquarters, furnish the information you have requested. However your letter has gone forward through claims channels and you may expect to hear from appropriate authority concerning the information requested in your letter within the next thirty days."

Thereafter, on July 31, 1952, Attorney Jones received another letter from Lt. MacLeod (plaintiff's Ex. 10(a) ):

"This is to inform you that your request for information concerning the crash of one of our aircraft in the Severn River must be refused. Our claims headquarters, Warner-Robins Air Material Area, has directed us that such information may not be furnished to anyone. Information of this sort is classified as restricted, and as such is unavailable. Furthermore, our regulations prohibit the aiding of any claimant in any way in the prosecution of a claim against the Government. For these reasons, your request must be refused.

"I hope that you can understand our position in this matter. However, if we can be of any help in any other way, such as the procedure of filing the claim, please do not hesitate to contact us."

Nothing further was done by libellant until the institution of this action on April 28, 1953. Is this, therefore, sufficient compliance with Sec. 740?

The letter of libellant's attorney was a reasonable request which could not have interfered with the security of the United States. While the final letter from the Claims Officer refers to "our aircraft", no information was given as to the agency responsible for dragging operations, which operations admittedly did the bulk of the damage. It is true that the Claims Officer indicated his

willingness to assist as to "the procedure of filing the claim", but if no information was forthcoming as to the federal agency owning or operating the vessel, assistance in procedure would be to no avail. Obviously the intent and purpose of the letter from the Claims Officer was to discourage the filing of a claim against the United States and, in fact, the letter so states. In short, will the Government be permitted to obtain the benefits of Sec. 740 and, at the same time, refuse to divulge any information as to the federal agency involved when this information is known to the Government and is not protected for security reasons?

Respondent urges that the letter from libellant's attorney to the Claims Officer affirmatively states the letter is not to be considered as a claim and, in such circumstances, courts are confined to "the letter of the statute" as such statutes must be strictly construed in favor of the sovereign. The Isonomia, 2 Cir., 285 F. 516, 520; Rambo v. United States, 5 Cir., 145 F.2d 670; McMahon v. United States, 3 Cir., 186 F.2d 227, 229; Schillinger v. United States, 155 U.S. 163, 166, 15 S.Ct. 85, 39 L.Ed. 108; The Harrisburg, 119 U.S. 199, 214, 7 S.Ct. 140, 30 L.Ed. 358; Department of Highways, State of Louisiana v. United States, 5 Cir., 204 F.2d 630.

Libellant relies upon Clark Terminals of Boston v. United States, D.C., 100 F. Supp. 59, and Portland Tug & Barge Co. v. United States, D.C., 90 F.Supp. 593. As to both of these cases, the damage had been sustained prior to the passage of Sec. 740.

■ It is the opinion of this Court that the intent of Congress in enacting Sec. 740 was to enable the Government to settle claims on an administrative basis, and to provide the United States with appropriate notice of a pending damage claim which may require investigation. The statute does not prescribe that the claim should be in or on any particular form. Certainly Congress could not have intended that injured parties be given the right to sue and, at the same time, permit federal agencies, where no security reasons are involved, the right of refusing any information known to them as to the identity of the agency with whom a claim should be filed. The very minimum response from the Claims Officer to libellant's attorney should have stated the identity of the crash boats involved in the dragging operations.

Do The Facts Indicate The Performance Of A Necessary Governmental Function With No Analogous Private Liability?

■ It is well settled that permission to sue the United States is limited under the Suits in Admiralty Act to instances where a proceeding in admiralty could be maintained if the public vessel had been privately owned and operated. Mejia v. United States, 5 Cir., 152 F.2d 686; United States v. Caffey, 2 Cir., 141 F.2d 69. Since the hearing in this case the United States Supreme Court has apparently put at rest the chaos which has heretofore existed on this issue with respect to the Federal Tort Claims Act. In the case of Indian Towing Co. v. United States, 76 S.Ct. 122, 126, the Court imposed liability on the United States for negligence of the Coast Guard in the operation of a lighthouse light. After reviewing the efforts of various courts "to reconcile the irreconcilable", and applying the analogy of the Suits in Admiralty Act, 41 Stat. 525, (referred to in a footnote), the Court said:

"On the other hand, it is hard to think of any governmental activity on the 'operational level,' our present concern, which is 'uniquely governmental,' in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed."

Respondent admits in its brief that the permission to sue the sovereign under the Public Vessels Act and the Suits in Admiralty Act is interpreted in like manner as the Federal Tort Claims Act on the issue above stated. Respondent urges that Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, and

Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, are controlling. While Dalehite is persuasive, the legal effect of this case is considerably limited by Indian Towing Co. v. United States, supra.

The Government insists that the actions resulting in the alleged damages involved herein could have no private counterpart. It will be noted that the statute refers to private liability "under like circumstances"—not "under the same circumstances". If a commercial aircraft fell "under like circumstances", it may well be anticipated that liability for removal may be imposed. Similarly, it may be the policy of commercial airlines to recover as much of the wreckage as reasonably necessary for their purposes in preventing other such disasters.

 The mere fact that the performance of the act is deemed to be a necessary governmental function affords no immunity under the Public Vessels Act. Maine v. United States, 1 Cir., 134 F.2d 574, certiorari denied 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720. It would indeed be difficult to conceive of a situation in which a public vessel was not carrying out a necessary governmental function. If there would be a corresponding liability on the owner of a privately owned vessel, the Government is entitled to no immunity. United States v. Lawter, 5 Cir., 219 F.2d 559.

Does The Governmental Duty To Remove Obstructions In Navigable Waterways Apply To The Specific Facts Of This Case And, If So, To What Extent?

 Respondent asserts that, under 33 U.S.C.A. § 414, the United States is authorized to remove sunken craft or other similar obstructions without liability for damage to the owner when they obstruct or endanger navigable waterways. The so-called Wreck Statute does not exonerate the United States from liability for negligence to the lessee of an oyster bottom—the immunity from liability only relates to the *owners of the object causing the obstruction*. Neither Sec. 414 nor 415 appears to be applicable under the facts of this case. Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631, is not related. The dragging operations in the instant case were strictly in the nature of recovery for alleged preventive purposes. Commendable though these purposes may be, it would certainly extend the words of the statute well beyond the intent of Congress to apply the doctrine of nonliability to the owners of property interests having been damaged by falling aircraft and the consequent removal of same from navigable waters.

### Paramount Right of Navigation

 The parties do not seriously dispute the basic principle of law to the effect that the right of navigation is paramount. This is not, however, an absolute right without regard to the lawful rights of other parties. The question seems to have been reasonably concluded in Anderson v. Columbia Contract Co., 94 Or. 171, 184 P. 240, 244, 7 A.L.R. 653, rehearing denied, 185 P. 231, in which it is said:

"* * * The navigator of a public stream must manage his craft with ordinary care and with due regard to the rights, property, and lives of others. * * * the paramount right of navigation must be exercised fairly, and not arbitrarily, and with due regard to the subordinate right of fishery, and a boat must be so navigated as not to do unnecessary damage. * * *"

It is obvious that the paramount right of navigation was not intended to cover extensive dragging operations to recover parts of a totally destroyed aircraft. Such dragging operations do not constitute "navigation" in the sense of granting a paramount right. The leasing of oyster grounds in no sense interfered with the navigability of the water flowing over these grounds. Parties having notice of the location and character of these oyster grounds were under a duty to exercise reasonable care and prudence to avoid damaging same. Adams v. Car-

ey, 172 Md. 173, 190 A. 815. The situation here presented is unlike that which existed in Western Union Tel. Co. v. Inman & I. Steamship Co., 2 Cir., 59 F. 365, United States v. Henry Steers, Inc., D.C., 8 F.Supp. 363, Bell Tel. Co. v. Dravo Corp., 371 Pa. 98, 88 A.2d 737, and other related cases.

### The Negligence

 Little need be said as to the negligence of the agency conducting the dragging operations. No efforts were made to protect libellant's property interests, i. e., his oyster grounds, in any degree. The condition of the tide, the type of boat and equipment used, and the speed of the vessel are merely illustrative of a reckless disregard of libellant's rights. Irrespective of the regulations setting forth the general policy of recovering as much wreckage as possible, it is perfectly apparent that many unnecessary runs were made with the vessel after determining that the aircraft had exploded. The right to recover damages occasioned by negligent dredging operations in the vicinity of oyster beds has been upheld in J. H. Miles & Co. v. McLean Contracting Co., 4 Cir., 180 F.2d 789. To the same effect, see: The Oyster Cases, Mansfield & Sons Co. v. United States, 94 Ct.Cl. 397; Beacon Oyster Co. v. United States, 105 Ct.Cl. 227, 63 F.Supp. 761; H. J. Lewis Oyster Co. v. United States, 123 Ct.Cl. 358, 107 F.Supp. 570.

That the Air Force personnel knew of the existence of oyster grounds is not in dispute. In view of the fact that they did nothing to minimize the damages, the respondent must answer for their acts.

### The Damages

 To determine a proper formula for ascertaining the damages to libellant's oyster grounds is admittedly difficult. As was said in The Oyster Cases, Mansfield & Sons Co. v. United States, supra, 94 Ct.Cl. at page 420:

"The amount of damage cannot be determined with any degree of accuracy and finality. However, nei-

ther the fact that damages are difficult to ascertain nor that they cannot be calculated with mathematical accuracy constitutes a bar to recovery * * *.

"All that is required is the allowance of such damages as, in the judgment of fair men, directly and naturally resulted from the injury sustained".

This is not a claim for damages by reason of loss of future profits—it is, in fact, a claim for the value of the crop at the time and place of destruction, i. e., the loss of harvestable oysters for the year 1952, and a reasonable value of the oyster beds destroyed. Such damages, if not entirely speculative, are recoverable under the Federal and Virginia authorities. Beacon Oyster Co. v. United States, supra; United States v. 576.734 acres of land, 3 Cir., 143 F.2d 408, certiorari denied 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576; Ralston v. United Verde Copper Co., 9 Cir., 46 F.2d 1; Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; City of Portsmouth v. Weiss, 145 Va. 94, 133 S.E. 781; Manss-Owens Co. v. H. S. Owens & Son, 129 Va. 183, 105 S.E. 543. A discussion on the subject "Measure of Damages for Injury to or Destruction of Growing Crops" appears in 175 A.L.R. 159 et seq. It is clear that no particular formula need be ascertained. Standard Oil Co. of New Jersey v. Southern Pacific R. Co., 268 U.S. 146, 45 S.Ct. 465, 69 L. Ed. 890.

Tested by these principles, what are the damages reasonably ascertainable? At the outset we have the admitted testimony that the libellant's oyster beds were considered as excellent, and that the 1952 season was the best that had been encountered for many years. The market was good and any reasonably competent oysterman could have harvested a profitable crop during the fall of 1952, a period of four or five months following the dragging operations.

The testimony of James B. Engle, a biologist employed by the Fish and Wildlife Service of the United States Depart-

ment of Interior, furnishes the basis for determining a fair ascertainment of damages as distinguished from purely speculative damages. On May 26–27, 1954 (two years after the crash and one year following the institution of this action), Engle visited the libellant's oyster grounds. He was accompanied by libellant, libellant's son, an inspector from the Virginia Fisheries (Hogge) and one Catesby Jones, Jr. (son of one of libellant's attorneys). In a small outboard motor boat handled by libellant's son, the party inspected the grounds. Libellant handled the tongs and was described by Engle as being "proficient". Jones acted as clerk and recorded the findings. Engle handled the sounding pole and examined the oysters that were brought into the boat by the tongs. Engle, although without a measuring device, concluded that the normal tong opening would be approximately two feet, thus leaving a draft of four square feet or 576 square inches. Apparently libellant did not dissent as to this conclusion at that time, although he now insists that this was an obvious error. As this conclusion is essentially material on the question of damages, it should be noted that, at the time of trial, libellant gave a physical demonstration of a normal tong grab from an elevated position in the courtroom. Such demonstration indicated that the normal opening measured one foot with a 19½ inch measurement from point of prong to prong, thus establishing a draft of 234 square inches as contrasted with 576 square inches computed by Engle. While it may be humanly possible for a tonger of unlimited strength to open the tongs a distance of 2 feet, the libellant's age and physical development would not indicate such would be possible over any period of time. In addition, another tonger present in court referred to libellant's physical demonstration as "normal" for a good tonger. By reason of the fact that Engle predicated his calculations in part on the size of the tong grab, it is pertinent to determine the approxi-mate size of same. With due allowance for differences of opinion and the possibility that libellant, either consciously or unconsciously, may have minimized the normal tong grab at the time of his physical demonstration, the Court concludes that libellant's normal tong grab would establish a draft of 384 square inches, thus diminishing the estimate of the witness, Engle, by one-third.

The investigating party proceeded to the northeast corner of the oyster grounds as libellant had indicated that this area was substantially free from damage caused by the dragging operations or the plane crash. It was this area which was used as the best available basis for determining the possible total population of the area prior to any damage. When we consider that libellant had testified that his plantings of oysters were substantially evenly distributed throughout the entire area leased from the Commonwealth of Virginia, and that only the northeast corner (approximately one acre) was "undisturbed", it must be inferentially acknowledged that the remaining area was materially damaged by the dragging operations.

Engle estimated that the average number of market or large oysters (3½ to 4 inches in length) required to fill a Virginia legal bushel was 345. Libellant produced in court a Virginia legal bushel filled with oysters which, according to count, numbered 178 [1]. These oysters varied in size from 4 to 6½ inches in length, but it is generally conceded that the entire bushel was in excess of average size and would be classified in the $3.50 per bushel prevailing rate in 1952 for the larger size oyster. While it is problematical as to the determination of an average quantity in a Virginia legal bushel, the Court is of the opinion that a figure of 250 oysters to a bushel would be essentially fair.

The total area of libellant's oyster leases aggregated 23.30 acres, but all of this area was admittedly not affected by respondent's operations. From the evi-

---

[1]. At one place in the testimony the count is listed at 169.

dence adduced at the trial and an examination of the charts, it would appear that a fair estimate of the acreage affected would be sixteen acres.

With these preliminary findings, it is now reasonably probable that an approximation of libellant's loss may be reached. Respondents urge that libellant's plantings were, of necessity, in the Mobjack Bay area—a point some miles distant from the northwest prong of the Severn River—where libellant and a brother operated in partnership and derived a substantial income from their 1953 harvest. The so-called 1952 season (beginning in the fall of 1952 and continuing into the spring of 1953) was a banner year for the oyster industry. The crop was excellent and substantially free from green gill or lean meats. It was the first season the oysterman had been successful in pointing to a profitable operation for several years. Libellant had planted the following quantities and had harvested none since 1947 due to the quality of the oysters, the condition of the market, or the presence of green gill:

| 1947 | 3504 bushels |
| 1948 | 4487 bushels |
| 1949 | 5083 bushels |
| 1950 | 4994 bushels |
| | 18,068 bushels |

After the Severn River acreage was partially destroyed in the spring of 1952, it was only logical for libellant to turn to his Mobjack Bay plantings for a continuation of operations. There is no credible evidence that libellant failed to plant the quantity stated in the Severn River, or that he diverted any of the 18,068 bushels to Mobjack Bay. The nature of libellant's plantings were twofold—certain seed oysters were purchased by libellant from tongers in the James River area, and other quantities were transplanted from natural growth from other grounds leased by libellant [2]. The breakdown of these plantings are as follows:

| Year | James River Seed | Shell Oysters | Total |
|------|------------------|---------------|-------|
| 1947 | 1204 bushels | 2300 bushels | 3504 bu. |
| 1948 | 1722 " | 2765 " | 4487 bu. |
| 1949 | 2473 " | 2610 " | 5083 bu. |
| 1950 | 2454 " | 2540 " | 4994 bu. |
| 1951 | none | none | none |

This Court cannot accept the inference that the entire 18,068 bushels happened to be planted in the particular area damaged by dragging operations. The libellant's records produced in Court were, at best, incomplete and, although libellant stated that he had additional records at home and was twice instructed by the Court to produce same, he failed to do so over a five day period of trial. As the affected area constituted approximately four-sevenths of the total area involved, the Court, allowing for probable increased plantings in the northern area, has decreased the plantings by one-third in the so-called damaged area, thus leaving:

| Year | James River Seed | Shell Oysters | Total |
|------|------------------|---------------|-------|
| 1947 | 803 bu. | 1533 bu. | 2336 bu. |
| 1948 | 1148 bu. | 1843 bu. | 2991 bu. |
| 1949 | 1649 bu. | 1740 bu. | 3389 bu. |
| 1950 | 1636 bu. | 1693 bu. | 3329 bu. |
| Total | 5236 bu. | 6809 bu. | 12,045 bu. |

2. These transplants are referred to as "shell oysters".

■ Oysters planted for a period of from two to three years in the northwest prong of the Severn River may reasonably be expected to yield on the basis of one and one-half to one, i. e., for every 1,000 bushels planted, the yield should be 1,500 bushels. There is some testimony that the yield would be as great as two for one, but this is rather optimistic. The older the oyster, the lower the yield —it therefore follows that, according to the testimony, the yield for 1947–1948 plantings would probably be somewhat less than one for one. As to the prevailing price of oysters during the 1952 season, we find all witnesses agree that 1952 was an excellent year with prices ranging from $2.00 to $3.50 per bushel on libellant's dock. Bearing in mind that the larger oyster is generally the older oyster, the Court has applied a price of $3.00 per bushel to the 1947–1948 plantings, and a price of $2.00 per bushel to the 1949–1950 plantings. The cost of tonging and marketing the oysters is calculated at 50¢ per bushel and one-half of the oysters would reasonably be chargeable as an expense in the employment of some person other than libellant. Accordingly, the following computation appears reasonable:

| Year | Bushels Planted | Ratio of Yield | Total Yield | Price | Total |
|------|-----------------|----------------|-------------|-------|-------|
| 1947 | 2336 | 1/2:1 | 1168 | $3.00 | $ 3,504.00 |
| 1948 | 2991 | 1:1 | 2991 | 3.00 | 8,973.00 |
| 1949 | 3389 | 1-1/2:1 | 5083 | 2.00 | 10,166.00 |
| 1950 | 3329 | 1-1/2:1 | 4993 | 2.00 | 9,986.00 |
| Totals | 12,045 | | 14,235 | | $32,629.00 |

Less: Cost of tonging and marketing 7117½ bu. @50¢ 3,558.75

Net Loss: $29,070.25

■ Libellant urges that an additional amount should be permitted by way of damages to the leasehold or oyster ground. The proof on this item is largely speculative and there is evidence of the fact that the grounds were greatly improved in 1954—even to the extent of permitting planting.

A judgment will be entered in favor of the libellant against respondent in the sum of $29,070.25 with interest from the date of the entry of the order. Proctors for libellant will prepare said order and, after presentation to proctors for respondent for inspection, forward the order to the Court for entry in accordance with this opinion, which is adopted as the Court's findings of facts and conclusions of law pursuant to Admiralty Rule 46–½, 28 U.S.C.A. The respondent's motion to dismiss is denied for reasons heretofore discussed.