## BEACON OYSTER CO. v. UNITED STATES.

### No. 45766.

Court of Claims.

Jan. 7, 1946.

WHITAKER, Judge, dissenting.

J. Edward Burroughs, Jr., of Washington, D. C. (Homer Cummings and William Stanley, both of Washington, D. C., on the briefs), for the plaintiff.

Robert Burstein, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen. (Irvin M. Gottlieb, of Washington, D. C., on the briefs), for the defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, and JONES, Judges.

WHALEY, Chief Justice.

This case comes before the Court under a special jurisdictional act, Act June 9, 1942, 56 Stat. 1183, conferring jurisdiction to hear, determine, as to liability of the United States, and render judgment upon the claim of the plaintiff for compensation for damages sustained by it by reason of the injury to its oyster beds at Quonset Point, R. I., as a result of dredging operations carried out in behalf of the United States in connection with the establishment of the naval air station at Quonset Point in the year 1940.

The plaintiff filed its petition under this act and claims compensation for the damages mentioned in the act. The case is one of tort, and not of taking.

The plaintiff was an established oyster grower, propagating, growing, and marketing oysters in New England coastal regions, and processing the oysters at Wickford, R. I.

At the time of the injury complained of the plaintiff held leases from the State of Rhode Island on 206.8 acres of oyster grounds lying immediately south and southwest of Quonset Point in Narragansett Bay. This area was known as Section 170–A and the plaintiff had divided it into 15 lots or beds, numbered 1 to 15, inclusive.

The findings of fact recite the order of events leading up to the acquisition of land and the development of a waterfront for a naval air base at Quonset Point.

The first indication made public, that Quonset Point would be selected for a naval air station, was in the Hepburn Report of January 3, 1939, which recommended Quonset Point as the location for a major naval air base. Admiral Hepburn, after whom the report was named, was chairman of the board that made the report. This board was made up of officers appointed by the Secretary of the Navy, pursuant to the Act of May 17, 1938, 34 U.S.C.A. § 498i, to recommend sites for naval bases or facilities. Legislation followed April 25, 1939, authorizing an appropriation, and on May 25, 1939, came the appropriation for the site. In the fall of 1939 preliminary surveys were made. Nothing definite was publicly forthcoming as to the location of the site at Quonset Point until December 1939, when bids were advertised for construction of a neutrality patrol base south of Quonset Point.

On January 4, 1940, plaintiff's representative personally called upon the defendant's officer in charge of construction at Quonset Point and discussed with that officer the work south of Quonset Point in the territory where plaintiff's 206.8 acres, Section 170–A, consisting of 15 beds, lay.

The work was awarded to Callan Construction Company January 29, 1940. On learning of this award the plaintiff, February 9, 1940, asked the contractor what work would be done and when it would begin, and the next day, February 10, 1940, was advised by the contractor simply that the dredge would begin operations at the site

of the project shortly after February 15, 1940.

The plaintiff thereupon, February 12, 1940, began removal of its oysters from beds numbered 1, 2 and 3, which were immediately south of the projected operations by the Callan Company, to beds numbered 6 and 14, farther south and west.

During the period February 12 to 19, 1940, the plaintiff so transferred 5,375 bushels. In addition, during the same period, it removed 1,000 bushels from certain of its propagating beds in Connecticut to bed No. 6, Quonset Point south.

Then, after vacation of a temporary restraining order that had been secured by the plaintiff, the Callan Construction Company began dredging south of Quonset Point, March 8, 1940, and completed this operation in about five months, which would be early in August of the same year.

The plaintiff had its normal business to attend to and could not devote its entire time to the mitigation of damages.

On April 2, 1940, the plaintiff purchased from another oyster company leases on 605.4 acres of oyster beds in Section 136–A, north of Quonset Point, reselling leases April 11, 1940, on 102.4 acres, without profit or loss, leaving 503 acres held by the plaintiff, divided into 18 beds, numbered 1 to 18, inclusive.

In acquiring this acreage north of Quonset Point the plaintiff took into consideration the probability that it could be used for growing oysters only two or three years on account of naval air station development.

The beds acquired north of Quonset Point were to be used and were used for the growth of oysters both from propagating beds in Connecticut and from growing beds south of Quonset Point.

As indicated, the plaintiff had its normal business to attend to. It did not resume the transfer of oysters until May 13, 1940, and from that date through July 26, 1940, it moved 2,450 bushels from beds 6, 11, 12, and 14 south of Quonset Point to bed 19 south of Sauga Point (not here involved), and 18,550 bushels from beds 4, 5, 6, 11, 12, and 14 south of Quonset Point to beds 7 and 9 north of Quonset Point.

From July 26, 1940, to November 8, 1940, the plaintiff confined its removal of oysters to removals from north of Quonset Point. From November 8, 1940, to December 12, 1940, the plaintiff moved 1,600 bushels from beds 6, 11, and 12 south of Quonset Point to bed 19 south of Sauga Point.

The precaution of removing oysters from beds 1, 2, 3, 4, 5, 6, 11, 12, and 14 south of Quonset Point was justified under the circumstances. The defendant was using an hydraulic type of dredge, which disturbed the water and spread mud and silt over surrounding territory. The threat was real.

Further removal of oysters from beds south of Quonset Point was made impossible by the defendant's action in sweeping plaintiff's buoys and markers from beds south of Quonset Point. This effectively put an end to all oyster operations. The first sweeping occurred in July, 1940, and affected beds 1, 2, 3, 4, 5 and 15. Later, on or about November 8, 1940, and January 6, 1941, plaintiff received notice that the remainder of its beds south of Quonset Point would have to be cleared of all oyster markers because of the commencement of seaplane operations, and shortly thereafter the markers were removed.

The foregoing is the situation south of Quonset Point.

### North of Quonset Point.

As to the situation north of Quonset Point, it will be observed that during the period May 13 through July 26, 1940, 18,550 bushels were moved from beds 4, 5, 6, 11, 12 and 14 south of Quonset Point to beds 7 and 9 north of Quonset Point, and it was on the latter date, July 26, 1940, that the fish and game administrator for the State of Rhode Island forwarded to plaintiff a letter of July 25, 1940, from the U. S. Engineer Office, War Department, Providence, R. I., outlining the work to be done north of Quonset Point, constructing a pile and timber bulkhead and dredging, filling solid behind the bulkhead. The plaintiff thereupon filed a formal protest, as it was authorized to do, and plaintiff received details as to the area of operations.

A large hydraulic dredge, with a capacity of about 47,000 gallons a minute, moved into the area on or about August 8, 1940, taking over a part of plaintiff's newly acquired oyster beds, and began dredging operations about August 15, 1940. The dredging operations are described in some detail in the findings of fact. Two large hydraulic dredges and one smaller hydraulic dredge were used in the pumping operations, the two large dredges being used at times in tandem or relay, the smaller dredge pump-

ing out undesirable material from behind the bulkhead. In the initial stages the bulkhead was left with openings through which was discharged water and wasted material.

Such an operation, of course, stirred up quantities of mud and silt, which were spread by the currents and tides. As a consequence, mud and silt were deposited on plaintiff's oyster beds, smothering and killing oysters. The work proceeded without regard to plaintiff's interests, although there is no indication or intimation that the defendant's engineers or other agents went out of their way to inflict injury.

Plaintiff's beds 15, 16, 17, and 18 were within the bulkhead, but no oysters had been moved to those beds by the plaintiff. The area dredged included beds 9, 10, 11, 12, 13, and 14 and the southernmost parts of beds 6, 7 and 8, all of which, with the exception of beds 6 and 8, had been planted. Plaintiff had moved from certain of its beds south of Quonset Point, during the period May 13 to July 26, 1940, 4,100 bushels to bed 7 and 14,450 bushels to bed 9 north of Quonset Point, a total of 18,550 bushels. From its Connecticut beds it had moved in May and June, 1940, 7,788 bushels to bed 10; 7,806 bushels to bed 11; 12,180 bushels to bed 12; 9,335 bushels to bed 13; and 8,140 bushels to bed 14, all north of Quonset Point, a total of 45,249 bushels from Connecticut, a grand total of 63,799 bushels planted north of Quonset Point from Connecticut and south of Quonset Point.

The plaintiff had thus planted the following beds north of Quonset Point before dredging operations began north of Quonset Point: Nos. 7, 9, 10, 11, 12, 13, and 14, in all, seven beds.

July 26, 1940, was the date on which the plaintiff was officially notified of the dredging operations to be done north of Quonset Point. From then on the plaintiff undertook to transplant oysters from these seven endangered beds to other beds, with a view to salvage. It removed from beds 9 and 12 to beds 1 and 2 farther north 21,825 bushels. Defendant's scows and barges made full removal impossible. From beds 10, 11, 13 and 14 it removed 15,825 bushels to beds 3 and 5. The removal to beds 3 and 5 proved to be not entirely a fortunate move, for later, in March, 1941, when some of the oysters transplanted there were picked up, they were found to have been killed by mud and silt from defendant's dredging operations.

What the defendant therefore deprived the plaintiff of, by including in the bulkhead or by dredging were a part of beds 6, 7 and 8, and all of beds 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18, with unharvested oysters thereon.

Plaintiff, because of the construction of the naval air base north and south of Quonset Point, abandoned its oyster business, which had been centered at Wickford. The plaintiff sought and secured from the State of Rhode Island cancelation of its oyster-bed leases south of Quonset Point January 2, 1941, certain of them on that date north of Quonset Point, and the remainder north of Quonset Point March 13, 1941. The plaintiff's inability to make any further use of the major part of its oyster-bed holdings effectively put an end to the use of what remained.

■ We have recited these facts in some detail, not because any one detail is important, but because all together they show three things, (1) plaintiff's diligence in saving itself from an unfortunate situation and therewith minimizing damages, (2) the character of the dredging operations, which of themselves constitute negligence, and (3) the fact that the plaintiff suffered actual and direct damages although their extent is capable of approximation only.

■ It was the plaintiff's duty to keep damages down to a minimum, and this duty was fairly performed.

In the Oyster cases, Mansfield et al. v. United States, 94 Ct.Cl. 397, a suction type of dredge was employed in dredging a channel, which damaged and destroyed oyster beds. The work there was part of the improvement of New Haven Harbor. Here no harbor improvement is involved. The work consisted of the establishment of a naval air base. In both instances special acts gave this Court jurisdiction.

In the case now presented, a suction type of dredge was also employed. In the Mansfield cases, 94 Ct.Cl. 416, we said: "A suction dredge, because of its very method of operation, necessarily would cause great agitation on the bottom of the channel and, in this manner and through the overflow from the bins, would place quantities of solid matter in suspension in the water, endangering the adjacent property. Under these circumstances the use of a suction dredge in the channel of New Haven Harbor constituted negligence on the part of defendant."

Here also the use of a suction dredge, notwithstanding that it operated somewhat differently, nevertheless constituted negligence per se. The Government's engineers may have found the use of a suction dredge desirable, even necessary, and they may have handled it efficiently, but that possibility does not relieve the defendant of liability, under the special jurisdictional act, of responding in damages.

As to the presence of negligence, and the responsibility of the defendant therefor, we are unable to distinguish this case from the Mansfield cases.

There is no question that the plaintiff has suffered a loss through the negligent act of the Government in the method by which this work was performed. It is impossible to arrive at the amount of damages with any mathematical accuracy. This situation does not constitute a bar to recovery. Hetzel v. Baltimore & Ohio R. Co., 169 U.S. 26, 18 S.Ct. 255, 42 L.Ed. 648; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Eastman Kodak Co. v. Southern Photo Material Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co. et al., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

It is possible to arrive at a jury verdict and, under the facts and circumstances of this case, the court, acting as a jury, arrives at a verdict of $20,000 as full compensation for the damages sustained.

The plaintiff also claims damages for decrease in value of its plant at Wickford, R. I. As pointed out in the Mansfield cases, 94 Ct.Cl. 414, "special acts are always strictly construed." The special jurisdictional act limits recovery to "compensation for damages sustained by said claimants by reason of the injury to their oyster beds at Quonset Point." The Wickford plant itself was untouched, lessening of the value thereof was consequential and indirect, and strict construction of the jurisdictional act precludes consideration of damages to anything else than the oyster beds. Bothwell v. United States, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238; Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; Mullen Benevolent Corporation v. United States, 290 U.S. 89, 54 S.Ct. 38, 78 L.Ed. 192; United States v. General Motors Corporation, 323 U.S. 373, 379, 65 S.Ct. 357, 156 A.L.R. 390.

The plaintiff is entitled to recover $20,000. Judgment is given accordingly, and it is so ordered.

JONES and LITTLETON, Judges, concur.

WHITAKER, Judge, dissents.

MADDEN, Judge, took no part in the decision of this case.