Edward P. BLAKE, Appellant,

v.

UNITED STATES of America, Appellee.

Odell M. BLAKE, Appellant,

v.

UNITED STATES of America, Appellee.

Eldridge COOK, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 8331–8333.

United States Court of Appeals Fourth Circuit.

Argued June 23, 1961.

Decided Oct. 2, 1961.

William McL. Ferguson, Newport News, Va., and Catesby G. Jones, Jr., Gloucester, Va. (Ferguson, Yates & Stephens, Newport News, Va., on brief), for appellants.

William E. Gwatkin, III, Attorney, Department of Justice, Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Joseph S. Bambacus, U. S. Atty., Richmond, Va., and Morton Hollander, Attorney, Department of Justice, Washington, D. C., on brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This is an appeal from a decree of the District Court dismissing three consolidated libels filed in admiralty against the United States to recover compensation for the taking of certain oyster grounds of the libellants located in the bed of the lower York River in Virginia, which is said to have occurred when the Government established a Naval Mine Sweeping Practice Area in the vicinity.

Libellants became lessees of oyster grounds situated in the York River in the vicinity of Yorktown in 1946 and 1948 under leases from the State of Virginia which were duly recorded under the laws of the state. The oyster grounds are located for the most part to the south of the northern line of the natural navigable channel of the river and in smaller part to the north of this line. The channel is marked in this area at a depth of 20 feet by red nun buoys which have been in their present position since 1912. The oyster grounds lie across the channel of the river from the site of the Naval Mine Warfare School which, at the time the present controversy arose, was located on the south side of the river at Yorktown. The school was established at Yorktown during the second World War and thereafter made use of the lower York River in mine sweeping exercises; and during this period the Navy, acting under temporary authorizations from the Army Engineers, periodically planted non-explosive mines in the lower river for use in the exercises of the school.

On February 9, 1955 the District Engineer of the Corps of Engineers, U. S. Army, issued a public notice stating that the permanent establishment in the lower York River of a Naval Mine Sweeping Practice Area and a Naval Drill Mine Field Area had been requested by the Navy for operations similar to those which had been conducted in the past on a temporary basis. The notice contained proposed regulations to be enforced by the Commandant of the Naval School, which restricted the use of the areas for structures or obstacles such as fish traps, beacons, buoys, piles, dolphins, etc., without the approval of the Commanding Officer of the school. The notice also included a chart showing the boundaries of the proposed areas and an invitation to interested persons to present objections to the proposed regulations. The northern boundary of the mine sweeping practice area described in the notice overlapped the oyster grounds so that a relatively small portion of the grounds were south of the northern line of the mine sweeping area while a larger portion were to the north of this line. Copies of the notice were mailed to numerous parties interested in navigation and fishing, to various governmental agencies including the Virginia Commissioner of Fisheries, to local newspapers and also to Postmasters of towns in the vicinity of the residences or places of business of the libellants. On March 17, 1955 a public meeting, held at the school in response to the notice, was attended by representatives of local interests, but not by the libellants, at which the proposals were considered and no objection was raised. Thereafter on May 3, 1955 the Secretary of the Army promulgated an amendment to Section 207.128 of Title 33 of the Code of Federal Regulations, prescribing Naval mine testing areas in the York River. The amended regulation outlined the boundaries of these areas and included restrictions upon the use of the river as above proposed. Subsequently, notice of the amended regulation was sent to all known interested parties who were advised that the amendment would become effective 30 days after its publication in the Federal Register on May 24, 1955. See 20 F.R. 3582–3583. Publicity was thus given to the promulgation of the regulation in conformity to the requirements of 33 U.S.C.A. § 1, to which reference is hereafter made. The evidence does not show that the libellants had notice of the meeting nor does it show when they received actual knowledge of the new regulation.[1]

The oyster grounds were marked principally by numerous stakes and buoys located both within and without the natural navigable channel of the river and the

[1]. The mine field area is less extensive than the mine sweeping area and the complaint seems to be directed toward the activities of the Government in the use of the latter area. In addition to these areas there was established as early as 1948 a Naval anchorage area in the navigable channel of the York River, the northern line of which was substantially the same as that of the mine sweeping area. The boundaries of a Naval anchorage area established in 1948 were also shown in the amended regulations.

Naval operating areas. The stakes consisted of unlighted wooden poles 35 to 40 feet long with a diameter of about 8 inches at the bottom, tapering to about 3 inches at the top, which were driven into the river bottom. The buoys were fashioned of similar poles attached at the bottom by chains to concrete blocks of about 350 lbs. in weight which rested on the river bottom. Some of the stakes and buoys were located as far as 300 yards within the navigable channel and the Naval areas at points south of the boundaries described in the leases. At no time either before or after the establishment of the Naval areas did the libellants seek or obtain permission from the District Engineer of the Army Corps of Engineers, or from the Commandant of the Mine Warfare School, or from any other representative of the United States, to place or retain in place any of the stakes and buoys; nor did they take any steps to remove the stakes and buoys after the area had been established.

In the spring of 1956 certain of the mine sweeping equipment was damaged by coming into contact with stakes or buoys within the Naval area and, accordingly, the Naval authorities determined to remove some of them, and in March 1956, ten months after the Naval areas had been formally established, the Commanding Officer of the school directed the removal of stakes and buoys in a number variously estimated from 61 to 100 all of which, according to the findings of the District Judge, were taken from areas within the navigable portion of the river south of the northern boundary line of the Naval areas. Following this removal the libellants were given notice of the existence of the Naval area and the restrictive regulations, but they replaced a few of the stakes without authority. These were subsequently removed by the Government in April 1956. Again in November 1957 three more buoys were removed by the Government from the Naval areas. Some effort was made by the Government without success to locate the owners of the stakes and buoys before they were removed in the first place but the Judge found that the

attempt to locate the owners was inadequate.

In general the damages claimed by the libellants relate to the value of the stakes and buoys removed and to injuries caused by their removal to the operation of the oyster grounds within the Naval areas as well as grounds adjacent thereto. It does not appear that the libellants planted oysters on the grounds alleged to have been injured by the Government during the period of the Government operations above described and for some years prior thereto. The Judge was of the opinion that the Government was within its rights in establishing the Naval areas and removing the stakes and buoys from the navigable channel and dismissed the libels.

The protection of the navigable waters of the United States from obstructions and the regulation of the use of these waters is lodged in the Secretary of the Army by the Acts of Congress, 33 U.S. C.A. § 403 and 33 U.S.C.A. §§ 1 and 3. Section 403 prohibits the creation of any obstruction to the navigable capacity of these waters not affirmatively authorized by Congress. The section also makes it unlawful to build any structures or make any excavations in the navigable waters without the authority of the Secretary.

Under this statute the Secretary of the Army issued certain fishing and hunting regulations which are codified as Part 206 of 33 Code of Federal Regulations. Section 206.50 thereof relates to fishermen, oystermen and crabbers acting under authority granted by either of the states of Maryland and Virginia. Such persons are authorized by Paragraph 1 of the regulation to construct and maintain fishing structures in these waters, including oyster ground markers and similar contrivances, subject to the provisions set out in the section. Paragraph 2 provides that the section does not set aside any waters exclusively for fisheries and does not supersede any danger zone or restricted area established in the Chesapeake Bay and its tributaries by the Secretary of the Army under Parts 204 and 207 of the chapter. Part

207 was subsequently amended by the promulgation of amended Section 207.-128 hereinafter referred to.

Paragraph 3 of section 206.50 expressly provides that the United States shall not be liable for damage to such structures which may be caused by operations undertaken by the United States for the maintenance of any waterway or for the protection of the public right of navigation.

The supervision of such structures is placed in the District Engineer by Paragraph 3(b) (1), and if he determines at any time that any fishing structure causes unreasonable obstruction to navigation, the owners, upon written notice, are required to remove it without expense to the United States. Paragraph (b) (2) provides that fishing structures which are improperly located shall be removed at the expense of the owner and that upon the owner's failure to do so they may be removed by the District Engineer at the cost of the owner.

The libellants contend that having secured the consent of the state of Virginia through the leases of the oyster grounds granted to them they have complied with the terms of Section 206.50 in the placing of their oyster markers. They argue that thereby they acquired property in the oyster stakes and buoys and in the oyster grounds, and that the Navy acted illegally and in excess of the authority of the statute and the regulations when it removed the stakes and poles without notice to the owners.

The rights of the parties, however, cannot be determined in this case without taking into consideration the effect of a later regulation which was promulgated as an amendment to 33 C.F.R. Section 207.128. This regulation was enacted under the authority of 33 U.S.C.A. §§ 1 and 3 which empower the Secretary of the Army to regulate the use of the navigable waters of the United States. Section 1 of this statute imposes the duty upon the Secretary to prescribe such regulations for the use, administration and navigation of the navigable waters of the United States as in his judgment

the public necessity may require for the protection of life and property or of operations of the United States in channel improvement. It is required that the regulation be posted in conspicuous and appropriate places for the information of the public and violation of this regulation is a misdemeanor punishable by fine or imprisonment. Section 3 empowers the Secretary of the Army, in the interest of National Defense and for the protection of life and property on the navigable waters of the United States, to prescribe such regulations as he may deem best for the use and navigation of any of the navigable waters of the United States endangered by artillery fire in target practice or by the proving operations of Government ordinance at or near such waters; but it is provided:

"That the authority conferred shall be so exercised as not unreasonably to interfere with or restrict the food fishing industry and the regulations prescribed * * * shall provide for the use of such waters by food fishermen operating under permits granted by the Department of the Army."

Section 207.128 as amended directly affected the libellants' property. It provided, as we have seen, for the establishment of a Naval Mine Sweeping Practice Area in the York River which overlapped the boundaries of the libellants' oyster grounds, and it specifically provided in Paragraph (b) 4 that no structures such as fish traps, buoys, piles, etc., shall be placed in the mine sweeping area without the prior approval of the Commanding Officer, Naval Schools, Mine Warfare, Yorktown, Virginia. The restricted area thus established falls within the terms of Paragraph 2 of Section 206.50 where it was said that the authority granted fishermen and oystermen to maintain fishing structures in these waters should not be interpreted as setting aside any area of the waters exclusively for fisheries, did not give any property rights or exclusive privileges therein, did not authorize any infringement of Federal regulations, and did not

supersede any danger zone or restricted area established by regulations prescribed by the Secretary of the Army. It follows that the libellants gained no right of action against the Government when it exercised its reserved power in the public interest. Nor may the libellants base their claim upon the fact, if it be a fact, that they had no notice of the promulgation of the amended regulation before the stakes and buoys were removed. The new regulation as we have seen, was formally determined upon and promulgated by the Secretary of the Army after public notice and discussion and after wide publicity was given to its enactment. Nothing more was required by the terms of 33 U.S.C.A. § 1 to make it binding upon all members of the public including the libellants. That section of the statute merely provides that the Secretary of the Army shall prescribe regulations for the use of the navigable waters of the United States and that the regulations shall be posted in conspicuous and appropriate places for the information of the public; and it is provided that every person who violates such regulations shall be guilty of a misdemeanor punishable by fine or imprisonment. We are in accord with the finding of the District Judge in this case that Section 207.-128 was validly promulgated after adequate public notice, and, since it acquired the force of law, it is binding upon the libellants as well as all other persons.

The libellants maintain the additional position that even if the mine sweeping practice area was validly established under Section 207.128 of the regulation the Government was not justified in the destruction of their property without compensation. It is said that the establishment of the area merely served the purposes of the Navy and the National Defense but did not widen the channel or improve the navigation of the river but rather tended to restrict it, and, therefore, did not constitute an exercise by the United States of its superior navigation easement. For this point libellants chiefly rely on United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, where it was held that owners of land in California, which was dependent upon seasonal inundations of the San Joaquin River, were entitled to compensation when they were deprived of these benefits in the construction by the United States of a gigantic project for the distribution of the waters of the Central Valley of the state. The Government defended on the grounds that the entire project was undertaken by Congress under its commerce power for the control of navigation. The court, however, held that although Congress had declared that the purpose of the project was to improve navigation, the entire legislative history of the enterprise showed that Congress had elected to treat the matter as a reclamation project and to take state created rights under its power of eminent domain. Since Congress itself in the exercise of its power to promote the general welfare, determined that the property owners were to be compensated the case was taken out of the field in which Congress proceeds under its power to control navigation. This circumstance obviously distinguishes the case from the case at bar.

The most recent case in respect to the proper exercise of the Government's dominant power to regulate and control navigation in the interest of commerce is United States v. Virginia Electric Co., 365 U.S. 624, at pages 627–628, 81 S.Ct. 784, at page 787, 5 L.Ed.2d 838, where the court said:

"This navigational servitude—sometimes referred to as a 'dominant servitude,' Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 686], or a 'superior navigation easement,' United States v. Grand River Dam Authority, 363 U.S. 229, 231 [80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186]—is the privilege to appropriate without compensation which attaches to the exercise of the 'power of the government to control and regulate navigable waters in the interest of commerce.' United States v. Commodore Park, 324 U.S. 386, 390 [65 S.Ct. 803, 805, 89 L.Ed. 1017]. The power 'is a

dominant one which can be asserted to the exclusion of any competing or conflicting one.' United States v. Twin City Power Co., 350 U.S. 222, 224–225 [76 S.Ct. 259, 260–261, 100 L.Ed. 240]; United States v. Willow River [Power] Co., 324 U.S. 499, 510 [65 S.Ct. 761, 767, 89 L.Ed. 1101]. A classic description of the scope of the power and of the privilege attending its exercise is to be found in the Court's opinion in United States v. Chicago, M., St. P. & P. R. Co.:

" 'The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. [Citing cases.] The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject.' 312 U.S. 592, 596–597 [61 S.Ct. 772, 775, 85 L.Ed. 1064]."

In view of the emphasis placed upon the Government's purpose to further the interests of the Navy in setting up the restricted area in the York River, the cases most pertinent for consideration are those in which the Government has undertaken to exercise its dominant servitude primarily or largely for its own benefit. In United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017, e. g., the owner of land adjacent to and in the bed of a navigable stream or creek in Virginia, whose title was recognized by the state, sued for damages caused when the United States filled in the creek with material dredged from a nearby bay in order to deepen the waters for the operation of large seaplanes in connection with an adjacent Naval Base. It was shown that the Government had acquired lands on both sides of the creek and that the deposit of the dredged material raised the bed of the creek to the level of the shores so as to incorporate the area as an integral part and useful part of the Base. It was urged by the riparian property owners that neither the dredging of the bay nor the deposit of the dredged material in the creek bore any substantial relation to commerce or navigation and, therefore, the Government should pay for the damages caused to the shore owners' property. The court rejected the contention. It said, 324 U.S. 391–392, 65 S.Ct. 806:

" * * * The 'fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional Power.' [State of] Arizona v. [State of] California, 283 U.S. 423, 456 [51 S.Ct. 522, 526, 75 L.Ed. 1154].

"All the waters affected were navigable. The Constitution entrusted to Congress the responsibility of determining what obstructions may, or may not, be placed in such waters. This power Congress may exercise itself or through its duly authorized agents. Here, the War Department, selected by Congress to pass upon when and to what extent, navigable waters may be altered or obstructed, permitted, and actually supervised, the program accomplished. Even though cases might arise in which the courts would look behind the judgment of this specially authorized agency, this is not such a case."

In the same connection see Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939; Bailey v. United States, 62 Ct.Cl. 77. The libellants rely on United States v. 412.715 Acres of Land, D.C.N.D.Cal., 53 F.Supp. 143, but in that case it was found as a fact that the Government in changing the navigability of the waters acted

for its own benefit only to the exclusion of the public.[2]

■■ It cannot be doubted that the numerous stakes and buoys located by the libellants in the natural navigable channel of the river in waters 20 feet deep were obstructions to navigable capacity within the prohibition of 33 U.S.C.A. § 403. Nor can it be doubted that the removal of the obstructions was an improvement of navigation which served not only the purposes of the Navy but the members of the general public who made use of the stream. Actions of the United States complained of, therefore, fell well within the reach of the cases above cited which hold that so long as the general interests of navigation are served it is irrelevant that special interests of the United States are also advanced.

■ Moreover, as is pointed out in the quotation from United States v. Commodore Park, supra, the determination of what obstructions may or may not be placed in navigable waters is a matter for the judgment of Congress and its authorized agents whose conclusions the courts may not normally question. For like reason there is no basis for libellants' argument that the regulation tends to restrict rather than facilitate navigation because, amongst other things, it forbids vessels to anchor in the mine sweeping area except in cases of emergency, prohibits the erection of such structures as fish traps, buoys, piles, etc., and confines vessels with a draft of 10 feet to a channel 300 yards wide during periods announced in advance. The argument ignores the plain fact that restrictions designed to protect the movement of vessels in a traveled area are aids rather than obstructions to navigation and that the regulation of such matters is in the hands of the Secretary of the Army.

Affirmed.

2. The libellants also rely on Beacon Oyster Co. v. United States, Ct.Cl., 63 F.Supp. 761, Seipp v. United States, Ct.Cl., 68 F. Supp. 205, and H. J. Lewis Oyster Co. v. United States, Ct.Cl., 107 F.Supp. 570, in which damages were allowed to oystermen for injuries to the property caused by dredging operations of the Government

but the decision in these cases was controlled by an Act of Congress, such as the Act of 1948, 28 U.S.C. § 1497, which provided for the relief of oystermen under such circumstances. Since these decisions were based on the Act of Congress they have no bearing in the present instance.